## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| ERIC LYNN MOORE, | § | |
| Petitioner, | § | |
| vs. | § | CIVIL ACTION NO. 6:03-CV-224 |
| | § | |
| DOUG DRETKE, Director, | | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | | |
| | § | |
| Respondent. | § | |

### MEMORANDUM OPINION AND ORDER[1]

Eric Lynn Moore ("Moore") brings this application for a writ of *habeas corpus* seeking to avoid execution on the grounds that he is mentally retarded (Docket No. 2). Having considered the record and conducted an evidentiary hearing, the Court **GRANTS** Moore's application. The Court will issue a writ of *habeas corpus* to respondent Doug Dretke ("the Director"), enjoining him from executing Moore.

### BACKGROUND

On December 10, 1990, Moore and three accomplices gained entrance to Richard and Elizabeth Ayers' home. The men brutally robbed and shot the elderly couple. Mrs. Ayers died from her wounds; Mr. Ayers, though paralyzed from the waist down, survived. On June 19, 1991, Moore was convicted of capital murder and on June 27, 1991 was sentenced to death.

On June 29, 1994, the Texas Court of Criminal Appeals affirmed Moore's conviction and

---

[1] This opinion constitutes the Court's findings of fact and conclusions of law. Any finding found to a conclusion is adopted as such and any conclusion found to be a finding is adopted as such.

sentence.  Moore then filed an application for state post-conviction relief, which did not include a claim that he was mentally retarded ("non-mental-retardation application").  The Texas Court of Criminal Appeals denied Moore's initial non-mental-retardation state application on November 25, 1998.  Moore then filed a federal non-mental-retardation application for writ of *habeas corpus* in this Court, which the Court denied on November 26, 2001, and  the United States Court of Appeals for the Fifth Circuit affirmed on April 7, 2003.

On June 20, 2002, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304, in which it held for the first time that it was unconstitutional to execute the mentally retarded.  In *Atkins*, the Court reasoned that a national consensus had been reached against executing mentally retarded offenders and thus doing so is unconstitutional under the Eighth Amendment as an excessive punishment.  *Id.* at 317, 321.  According to the Court, this consensus reflects the widespread belief that the mentally retarded are less culpable for their crimes.  *Id.*  The Court also stated that the same cognitive and behavioral characteristics that make the mentally retarded less culpable also make them less likely to be deterred from crime by the death penalty.  *Id.* at 320.  Furthermore, the Court found that some characteristics of the mentally retarded undermine the procedural protections in capital cases, such as aiding in their own defense.  *Id.* at 318, 320.  The Court also observed that the mentally retarded typically make poor witnesses and their demeanor may create an undeserved perception that they lack remorse.  *Id*. at 321.  The Court reasoned that these considerations increase the risk that the death penalty may be imposed despite factors that call for a less severe sentence.  *Id*. at 320.  Thus, the Court concluded that the mentally retarded face a special risk of wrongful execution.  *Id.* at 321.  The Court, however, left the task of appropriately enforcing the constitutional restriction against executing the mentally retarded to the States, which

2

brings us here. *Id.*

Shortly after *Atkins* was decided, Moore filed a second state application for post-conviction relief, claiming for the first time that he was mentally retarded and executing him would violate the Eighth Amendment ("mental-retardation application"). On February 5, 2003, the Texas Court of Criminal Appeals dismissed Moore's mental-retardation state application as an abuse of the writ because "it fail[ed] to contain sufficient specific facts which would satisfy the requirements of [Texas Code of Criminal Procedure] Art. 11.071, Sec. 5 (a)."

With the Fifth Circuit's permission, Moore filed a second federal application for a writ of *habeas corpus*, which included a mental-retardation claim. In *Atkins*, the Supreme Court specifically charged the states with defining mental retardation in the capital punishment context, and the Fifth Circuit has held that federal district courts should have no role in the resolution of *Atkins* claims until after the appropriate state courts have had the opportunity to apply *Atkins*. *Atkins*, 536 U.S. at 317; *Bell v. Cockrell*, 310 F.3d 330, 332-33 (5th Cir. 2002). Accordingly, on July 28, 2003, this Court granted Moore's application in part, finding the State had failed to provide the mental retardation determination hearing to which Moore was entitled under *Atkins* and directed the State to provide Moore such a hearing. However, on May 7, 2004, the Fifth Circuit vacated the writ and remanded the case back to this Court, directing this Court to determine whether Moore's claim is procedurally defaulted and, if not defaulted, for this Court to determine whether Moore is entitled to *Atkins* relief on his mental-retardation claim. *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2002) (per curiam). On June 8, 2004, this Court restated its earlier finding that Moore's claim had not been procedurally defaulted and found that Moore was entitled to an evidentiary hearing. The Court conducted such an evidentiary hearing on the issue of Moore's mental retardation on December 28-

30, 2004. Because this case involves a conviction and sentence imposed under state law, the Court applies state law in deciding Moore's application.

## STANDARD OF REVIEW

Relief in *habeas corpus* may not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication resulted in a decision that involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254 (d)(1). But if the state court did not adjudicate the claim on its merits, a federal court must determine the claim *de novo*. *Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir. 2000), *cert. denied,* 531 U.S. 849 (2000).

The Director contends the Texas Court of Criminal Appeals' decision—that Moore failed to allege specific facts that would satisfy the elements of the state's subsequent post-conviction application rule—actually meant that "his application was dismissed as abusive because it failed to contain sufficient, specific evidence of mental retardation." *See* Respondent's [sic] Dretke's Pre-Hearing Brief at 2 (Docket No. 63). The Director contends that a determination that an applicant's evidence was insufficient to establish his claim is an adjudication on the merits; therefore, this Court should apply the deferential standard of review of 28 U.S.C. § 2254 (d)(1), rather than the *de novo* standard. The Court disagrees for two reasons.

First, the Court of Criminal Appeals did not state that it dismissed Moore's application because it did not contain specific evidence of mental retardation. Rather, the court stated it dismissed his application because Moore failed to allege specific facts that would satisfy the elements of the state's subsequent application rule.

Second, the rule's plain language provides:

4

(a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.

TEX. CODE CRIM. PROC. art. 11.071 §5(a)(1). Even assuming *arguendo* that Article 11.071 section 5(a) requires an applicant to allege specific facts that would entitle him to relief on his mental retardation claim, the rule unambiguously states that if sufficient facts are not alleged, a court may not consider the merits of the claim. Therefore, the court's dismissal of Moore's subsequent application could not have been an adjudication on the merits of Moore's mental-retardation claim. Because Moore's claim is not procedurally defaulted and the deferential standard of review set forth in 28 U.S.C. § 2254 (d)(1) does not apply, this Court determines the issue of Moore's mental retardation *de novo*.

## DEFINING MENTAL RETARDATION

Since the Texas legislature had not enacted any guidelines for determining mental retardation in the capital-punishment context,[2] the Texas Court of Criminal Appeals reluctantly took on the task of setting forth interim guidelines in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Ct. Crim. App. 2004).

---

[2] Since *Atkins*, the biennial Texas Legislature has convened twice in regular session. In both the seventy-eighth and seventy-ninth legislative sessions, the Texas Legislature failed to enact legislation carrying out the *Atkins* mandate. After the seventy-eighth session convened without setting forth the legal structure to analyze *Atkins* claims, the Texas Court of Criminal Appeals was forced by the Legislature's inaction to provide the bench and bar with temporary judicial guidelines to address the swell of *Atkins* claims before the courts. *See Ex parte Briseno*, 135 S.W.3d 1 (Tex. Ct. Crim. App. 2004). At the end of the seventy-ninth legislative session, the Texas Legislature still had not enacted legislation setting forth standards for determining mental retardation in the capital-punishment context in Texas. House Bill 419, which addressed the issue, did not move out of the Criminal Jurisprudence Committee. Accordingly, *Briseno* still governs this analysis. The Legislature did pass Senate Bill 60, which modifies the alternative punishment in capital cases to life without parole from life with the possibility of parole.

5

The *Briseno* court adopted mental-retardation definitions used by the American Association of Mental Retardation ("AAMR") and by the Texas Health and Safety Code. *Id.* at 8. Both are similar. Under the AAMR definition, mental retardation is characterized by three elements:

(1) "'significantly subaverage' general intellectual functioning" defined as "an IQ of about 70 or below (approximately two standard deviations below the mean)";

(2) "accompanied by 'related' limitations in adaptive functioning" defined as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales";

(3) "the onset of which occurs prior to the age of 18."

*Id.* at 7 & n.24 & 25 (citing AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT 5 (9th ed. 1992) [hereinafter AAMR 9th ed.]). Under the Texas Health and Safety Code definition "'mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period" where "'[a]daptive behavior' means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group. TEX. HEALTH & SAFETY CODE ANN. §591.003(13), (1).

Both definitions require significant subaverage intellectual functioning with limited adaptive functioning and onset prior to adulthood. However, the AAMR definition is more specific, defining each of the elements more narrowly than the Texas Health and Safety Code definition, and is thus more useful in application. Both parties used the AAMR definition during the evidentiary hearing. Consequently, the Court will analyze Moore's claim using the AAMR definition.[3]

---

[3] Moore relies on the AAMR definition in his trial brief, and does not mention the Texas Health and Safety Code. The Director in his trial brief did not specifically mention either definition, although in discussing adaptive functioning, he used the term "deficit," which comes from the Texas Health and Safety Code, rather than

## APPLICATION OF THE AAMR DEFINITION TO MOORE

According to *Briseno*, for a defendant to avoid the death penalty he must prove by a preponderance of the evidence that he is mentally retarded. *See Briseno*, 135 S.W.3d at 12. Thus, the burden of proof is on Moore to show by a preponderance of the evidence that he had (1) significant subaverage intellectual functioning, (2) with related limits in adaptive functioning, and (3) the onset of which occurred prior to age eighteen.

### 1. Significantly subaverage general intellectual functioning

#### A. Standard

"'Significantly subaverage' general intellectual functioning" is defined "as an IQ of about 70 or below." *Id.* at 7 & n.24 (citing AAMR 9th ed. at 5). The American Psychiatric Association ("APA") recognizes four categories of mental retardation: mild, moderate, severe, and profound. *Id.* at 5 (citing APA, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41-42 (4th ed. 2000) [hereinafter DSM-IV]). Eighty-five percent of the mentally-retarded population are mildly retarded. DSM-IV at 41. Individuals with IQ scores between about 55 to 70 are classified as mildly mentally retarded if they satisfy the adaptive-functioning and age-at-onset criteria. DSM-IV at 40.

A standardized IQ test's mean score is typically 100, with a standard deviation of 15; thus, a score of about 70 is approximately two standard deviations from the mean. *Id.* IQ tests typically have a five point standard error of measurement, which means that any score actually represents a score that could be five points higher or lower. *See Briseno*, 135 S.W.3d at 14 n.53; DSM-IV at 39. Accordingly, a test score as high as 75 may represent an IQ as low as 70.

#### B. Documentary evidence and lay testimony

---

"limitation," which comes from the AAMR.

Moore has taken three IQ tests over the course of his lifetime: when he was in first grade, when he was twenty-four years old, and when he was thirty-eight years old.[4]  The second and third tests were taken during Moore's incarceration.  His scores on these tests were 74, 76, and 66, respectively.  The average of these three scores is 72.

C. Experts' opinions

Moore's expert, Dr. Llorente, administered Moore's third IQ test (WAIS-III), as well as a test of non-verbal abilities (TONI-2), which reduces the impact of the test taker's educational background on his score.  Moore's score on the WAIS-III places him in the lowest one percentile of the entire population, and his score on the TONI-2 places him in the lowest eight-tenths percentile of the entire population.  Dr. Llorente found Moore's third IQ test score to be consistent with his earlier scores.  Although Dr. Llorente could not testify with certainty to the margin of error in Moore's first test, Dr. Llorente did testify that these scores probably overlap when their margins of error are considered, which demonstrates consistency in their findings.  Moore's scores on other tests showed no response bias, which is an attempt by Moore to perform poorly.

Although Dr. Mears and the Director questioned the validity and accuracy of Moore's IQ tests,[5] on cross-examination Dr. Mears adopted all three tests' results and agreed that Moore satisfies this prong of the AAMR mental-retardation definition.

---

[4] The first test was the SRA Primary Mental Abilities Test (PMA), apparently given to him by his school. The second test, the Wechsler Adult Intelligence Scale-Revised (WAIS-R), was given to him by Dr. Richard Fulbright prior to his trial in 1991.  Dr. Llorente, Moore's expert, administered the third test, the Wechsler Adult Intelligence Scale-III (WAIS-III).

[5] The Director questioned Dr. Llorente's reliance on Moore's first IQ test, the PMA, because it is designed to be administered individually and there are no records to confirm this was done.  Dr. Mears testified that he believed Moore's second IQ test resulted in an artificially low score because it did not account for Moore's age and educational level.  On the third test, Moore missed questions that he answered correctly on the second test, and the Director implied that Moore intentionally missed these questions to achieve a lower score.

D. Court's findings

The average of Moore's three IQ test scores is 72.  With a five-point standard error of measurement and both experts agreeing that Moore satisfies this criterion for mental retardation, the Court concludes that Moore has proven by a preponderance of the evidence that he satisfies the AAMR criterion of subaverage intellectual functioning defined as an IQ of "about 70 or below."

**2. Related limitations in adaptive functioning**

A. Standard

Related limitations in adaptive functioning are "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales" that are related to the individual's cognitive deficiencies.  *Briseno*, 135 S.W.3d at 7 & n.25 (citing AAMR 9th ed. at 5).[6]  The AAMR sets forth

---

[6] In discussing adaptive functioning, the *Briseno* court also suggested an additional seven evidentiary factors "which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder." *Briseno*, 135 S.W.3d at 8.  Analysis of these additional factors is not required but is discretionary. These factors are: (1) whether those who knew the person best during the developmental stage thought he was mentally retarded at that time, and if so, acted in accordance with that determination; (2) whether the person formulates plans and carries them through or whether his conduct is impulsive; (3) whether his conduct shows leadership or shows that he is led around by others; (4) whether his conduct in response to external stimuli is rational and appropriate, regardless of whether it is socially acceptable; (5) whether he responds coherently, rationally, and on point to oral or written questions or whether his responses wander from subject to subject; (6) whether he can hide facts or lie effectively in his own or others' interests; and (7) whether, putting aside the crime's heinousness or gruesomeness, committing the crime required forethought, planning, and complex execution of purpose. *Id.*  The *Briseno* court suggested these factors to aid in differentiating between limitations in adaptive functioning caused by a personality disorder and those caused by mental retardation.  In *Briseno*, the defense expert concluded that Briseno was mentally retarded, but, using the same evidence, the state's expert found no mental retardation, instead finding evidence consistent with antisocial personality disorder. *Id.* at 13.

This Court will not analyze these factors for four reasons: First, the Director did not even argue or present evidence that Moore has a personality disorder that accounts for his deficiencies in adaptive functioning, which was the basis these factors were even mentioned in *Briseno*.  Second, even if such an issue had been raised, there is no evidence to support a finding that a personality disorder is responsible for Moore's cognitive and adaptive deficits.  Third, the Court notes that these factors are not part of the AAMR's definition of mental retardation, which the *Briseno* court substantively adopted as the test under *Atkins*.  Finally, according to *Briseno*, analysis of these additional factors is not required but is discretionary.

9

three adaptive-behavior areas applicable to determining mental retardation: conceptual skills, social skills, and practical skills. AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT 73 (10th ed. 2002) [hereinafter AAMR 10th ed.]. Conceptual skills include skills related to language, reading and writing, money concepts, and self-direction. *Id.* at 82. Social skills include skills related to interpersonal relationships, responsibility, self-esteem, gullibility, naivete, following rules, obeying laws, and avoiding victimization. *Id.* Practical skills include skills related to personal daily living activities such as eating, dressing, mobility, and toileting; instrumental daily living activities such as preparing meals, taking medications, using the telephone, managing money, using transportation, and housekeeping activities; occupational skills; and maintaining a safe environment. *Id.*

According to the AAMR, limitations in adaptive behavior can and should be determined by using standardized tests that are normed on the general population, which includes people with and without mental retardation. *Id.* at 83. A "significant" limitation is established by a score of two standard deviations below the mean in one of the three adaptive-behavior skill areas. *Id.* at 78.

There are many respected standardized measures that are commonly used, including the Vineland Adaptive Behavior Scales, the AAMR Adaptive Behavior Scales (ABS), the Scales of Independent Behavior, the Comprehensive Test of Adaptive Behavior-Revised, and the Adaptive Behavior Assessment System. *Id.* at 88-90. Typically, these measures require the clinician to interview a parent, teacher, or direct-service provider of the individual being assessed. *Id.* at 85. The interviewees should be well-acquainted with the individual's behavior over an extended period of time and in multiple settings. *Id.* Observations, interviews, and other assessment methods that

10

gather information about adaptive behavior may complement standardized measures but ordinarily should not replace them. *Id.* at 84.

However, diagnosing mental retardation will often require applying clinical judgment if earlier information is lacking or incomplete, if the individual's adaptive behavior cannot be assessed using standardized scales in his current environment, or if determining whether the onset was prior to age eighteen in an adult. *Id.* at 94. Such is the situation here. Clinical judgment is based on training, experience with others who are mentally retarded, and familiarity with the individual and his environment. *Id.* at 95. Therefore, the Court will consider the experts' clinical judgments and other evidence to determine whether Moore has significant deficits that place him approximately two standard deviations below the mean in adaptive functioning.

Individuals with mild mental retardation can develop social and communication skills in the first five years of life and have minimal sensorimotor impairments. *Id.* They are indistinguishable from non-mentally retarded children until a later age. *Id.* By the late teens, a mildly mentally retarded individual can acquire academic skills up to about a sixth-grade level. *Id.* As an adult, he is usually able to achieve social and vocation skills that allow for minimum self-support, but he may need supervision, guidance, and assistance, especially during times of unusual social or economic stress. *Id.* A mildly mentally-retarded adult can usually successfully live in the community, either independently or in supervised settings if given an appropriate support system. *Id.*

B. Documentary evidence and lay testimony

Moore's educational records are incomplete, which is not surprising given that they are twenty to thirty years old. However, the parties were able to provide the Court with Moore's school records from the first, fourth, fifth, last part of the sixth, and seventh grades from the Celina School

District.  The parties also provided the Court with Moore's third-grade records from the Plano School District.  The Court considers these records to be some of the most objective and enlightening evidence presented.

Additionally, the Court received testimony from numerous lay witnesses including Kelly Moore, Moore's younger sister; Carl Jackson, Moore's maternal uncle by marriage, who has known Moore since Moore was five or six; Betty Jackson, Moore's maternal aunt; Jean Lynn, Moore's maternal grandmother; Cynthia Easley, a junior-high-school classmate; Jackie Tyrone Brown, Moore's younger brother's childhood friend; Mary Bradshaw, Moore's first-grade teacher; Elizabeth Joan McKnight, Moore's fifth-grade teacher; Mary Hughes, a junior-high-school teacher; Larry Lambert, Moore's seventh-grade teacher; Jerry Moore (no relation), Moore's junior-high-school principal; and several correctional officers that work in Moore's death-row unit.

The Court will first consider the documentary evidence and lay testimony from Moore's early childhood to adulthood, and then consider the expert opinions in its analysis.

*i. Early childhood*

Mrs. Jackson, Moore's maternal aunt, thought Moore was withdrawn from other children and cognitively slow.  She testified that, on Moore's side of the family, she has an aunt and a cousin that are considered slow and a niece that has been diagnosed as mentally retarded.

Mr. and Mrs. Jackson both testified that Moore's father physically abused Moore and his siblings.  Moore' sister Kelly corroborated this.  Moore's father became abusive and violent towards Moore's mother when he drank.  Although the other children recognized the danger and tried to hide, Moore lacked this instinct and often tried to protect his mother.  Mr. Jackson testified that during one incident Moore's father had thrown Moore against a wall.

    *ii. School-age*

Kelly Moore, Moore's younger sister by a year, testified that at age six and seven Moore still had trouble putting the right shoe on the right foot. Mr. Jackson testified that Moore was slower to learn life skills like dressing himself and tying his shoes than Jackson's own children, who were younger than Moore. Moore also had difficulty learning to speak in sentences and paragraphs. When Mr. Jackson coached Moore's little league baseball team, he saw that Moore had a much more difficult time learning to play baseball than the other children his age.

Moore's grandmother, Jean Lynn, testified that she too thought Moore was slow and had trouble forming sentences. According to her, Moore was finally able to dress himself around age six or seven but was never able to ride a bike. While Mrs. Lynn testified that Moore could read as a young boy and particularly liked Jet Magazine, his sister testified that Moore was not really reading the magazine but rather looking at the pictures.

Moore started the first grade during the 1973-74 school year, but ended up having to repeat it. According to his school records, Moore achieved the grade "Unsatisfactory" in Arithmetic, Reading, Language and Grammar, and Handwriting. His records indicate he was retained and referred to special education.[7] In the spring of 1974, Moore took an achievement test, the "SRA form E." The normal achievement level would have been that of a first grader in his seventh month of school. However, Moore scored at the achievement level of a first grader with no additional months of school, at least seven months behind normal. One of the educators testified that the test

---

    [7] There seemed to be disagreement between Moore and the Director as to whether Moore attended special education classes. Moore did not present school records indicating that he was placed in a separate special education class, but argued that those records were destroyed. Moore has told others that he was in special education classes, and his family also confirms this. The Director tried to characterize the special education classes as the "corrective" classes that Moore was placed in for certain subjects within his mainstream classroom.

did not recognize a score below the first-grade level. By the end of the first grade, Moore was already performing at least seven months below grade level, and perhaps more.

Moore's first-grade teacher, Ms. Bradshaw testified that Moore was a slow student that needed help. Ms. Bradshaw could not recall whether she taught Moore during his first year in first grade or his second year in first grade when he was held back. She testified that while she would not "consider" him to be mentally retarded, she did not know the legal definition of mental retardation under the AAMR. She did find Moore to be socially awkward and quiet and could not recall whether he could tie his shoes or not. Ms. Bradshaw admitted that her memory of Moore is "very sketchy" and that he did not stand out in her mind.

After Moore repeated the first grade, he and his sister Kelly Moore were in the same grade, even though she was a year younger. They attended special education classes together. Kelly testified that her brother did not do well in school. "He couldn't stand to read or math; and I used to try and help him all the time, because we was basically in the same classes. . . . Basically I did most of his work because he just—he didn't do it. . . . He wanted to do it, but he just got frustrated trying to do it." Kelly testified that Moore was unable to do much math, but progressed somewhat in his ability to read.

Mrs. Jackson, Moore's aunt, testified that when Moore's older brother was on his deathbed, he confessed to her that his stepmother, Kathryn Goodman, had molested the Moore children. Kelly Moore corroborated this, testifying that Goodman physically and sexually abused all the Moore children. According to Kelly, Goodman's sexual abuse of Moore began when he was about nine years old. Kelly had seen Goodman inappropriately kissing Moore, giving him alcohol, and having intercourse with him when he was nine or ten years old. Kelly testified Goodman abused Moore

14

nearly every night taking advantage of him because he was slow.  The Moore family believes that Moore fathered Goodman's child when he was about ten years old.

Moore attended the third grade in Plano.  On his report card, his teacher indicated he was functioning at a second-grade level in Reading and Language and at third-grade level in Math.  Moore's Reading and Language grades were C's, his Spelling grade was a C-, his Math grade was a B-, and his Social Studies and Science-Health grades were B+'s.  However, his apparent average grades are belied by his documented scores on the Comprehensive Test of Basic Skills I, a nation-wide standardized test.  When Moore took the test, his actual grade level was 3.6.[8]  On the test, Moore tested at the 2.1 reading level, the 1.9 language level, and the 2.1 arithmetic/mathematics level.  These scores place Moore in the twelfth percentile in reading, the seventh percentile in language and math, and the sixth percentile overall.  Importantly, however,  these percentiles are based on other third graders, most of whom  would have been a year younger than Moore  because he repeated the first grade.  Overall, he tested at the 1.9 grade level, roughly a year and a half behind his actual grade level and two and a half years behind other children his age.

Mr. Brown, a childhood friend of Moore's younger brother, also testified that Moore was "real slow" and that "[h]e would kind of make you think that he was kind of halfway on the retarded side."  According to Mr. Brown, Moore did not learn things as easily as other children.  Mr. Brown testified that, despite being in "resource classes," when Moore was in the third or fourth grade he was still struggling with beginner reading books.  Although Mr. Brown is a few years younger than Moore, he would sometimes try to help Moore read these books.

In the fourth grade, Moore's grades ranged from the upper 60's in Arithmetic and Science,

---

[8]  Moore was in the third grade and six-tenths through the school year.

to the low 70's in Grammar, Reading, Geography, and Health, and to the mid to upper 70's in Spelling and Writing. Moore's highest grade, an 83, was in Citizenship. However, again, Moore's standardized test scores belie the grades he received. Moore scored at the level of a second grader in his ninth month of school when the normal score was that of a fourth grader in his seventh month. Moore was now performing nearly two years below his grade level, and three years behind other children his age.

### iii. Early adolescence

During the fifth grade, Moore participated in a "corrective reading" class rather than the regular fifth grade reading class. In corrective reading, Moore's overall grades were in the low 80's.[9] Although Moore achieved low A's and high B's in Citizenship, his grades in Grammar, History, Arithmetic, and Science were in the upper 50's and low 60's. However, again, Moore took another standardized achievement test, which indicated that he was performing well below his grade level. Although Moore was now a twelve-year-old fifth grader, he was performing at the same level as a third grader in the fourth month of the school year, more than two years behind his grade level and three years behind his age level.

Moore's fifth-grade teacher, Ms. McKnight, testified that Moore performed "a little below average" and she believed his performance "could have improved with more effort." Ms. McKnight testified that it was readily apparent when children in her classroom were mentally retarded, and she did not regard Moore as mentally retarded. However, on cross-examination she admitted that she did not know the legal or clinical definition of mental retardation. Ms. McKnight explained why she

---

[9] Because this was a corrective class, this grade is likely much higher than what he would have received in a mainstream class.

16

did not do more to help Moore academically: "Even though the flags [indicating cognitive difficulties] are there, your hands are virtually tied. There is not a lot to be done." Ms. McKnight did not consider Moore to be a leader, but thought he was more likely to join a group as a follower. Ms. McKnight testified she passed Moore on to the sixth grade because his already advanced age for a fifth grader made it preferable to pass him on rather than retain him in the fifth grade for another year.

With regard to Moore's sixth grade year in the Celina school district, the Court only has records from the last quarter, and no standardized achievement tests. His grades ranged from a 66 in Grammar, a 73 in Reading, a 70 in Spelling and History, to a 79 and 80 in Science and Arithmetic, respectively. Moore also earned a B+ in Citizenship.

In the seventh grade, Moore was again placed in a corrective Spelling class, in which he received a grade of 86.[10] His Grammar grade remained a 66 and his Reading grade remained in the low 70's, while his History grade dropped to a 33, his Arithmetic grade fell to a 42, and his Science grade fell to a 65. And, again, there were not standardized achievement test results for the seventh grade.

According to Ms. Hughes, a teacher at Moore's junior high school, Moore had some behavioral problems. He had trouble completing his work in her class and often appeared tired and sleepy. Ms. Hughes could not say whether Moore attempted to cover his inability to do the work by appearing tired and sleepy, a masking strategy she found common in children in remedial classes.

Mr. Lambert, a seventh-grade-science teacher at Moore's junior high school, testified that

---

[10] Again, because this was a corrective class, this grade cannot be compared to a grade in a mainstream class, in which Moore would have likely done very poorly.

he could not recall whether or not he actually taught Moore, but if he had, it would have been in seventh grade science.  He testified that Moore was just like all the other junior-high students, "mischievous and having a good time."  He testified that Moore's grades were in the 60's and 70's and, like all other students, Moore would have performed better had he applied himself more.  Mr. Lambert also testified that Moore did not appear to have any social or communication difficulties and that Moore was able to learn from his mistakes.  Finally, Mr. Lambert testified that all the children in the Moore family were thought of as "slow."

Moore's junior-high-school principal, Mr. Jerry Moore (no relation) testified that he also never suspected Moore was mentally retarded.  Mr. Jerry Moore also testified that he believed Moore negatively influenced other children.  When pressed, he admitted that he did not recall a lot about Moore and his conclusion about Moore's possible mental retardation was based on school records, which in his opinion did not indicate mental retardation.  He was unaware, and surprised to learn, that mentally-retarded individuals can achieve academic skills up to the sixth grade.  He had no explanation for Moore's missing school records.

Cynthia Easley, one of Moore's junior-high classmates, testified that Moore still struggled with reading and grammar, which drew ridicule from the other children.  She stated that Moore was sometimes unable to follow instructions written on the chalkboard and recalled an occasion when Moore was unable to cut stars out of paper during a group project.  Ms. Easley thought Moore could do addition and subtraction, but he had problems with division.  She testified that although the teachers placed Moore in special classes, they passed him on.

Ms. Easley described Moore as distant, a loner, a little slow, and as a follower who was easily manipulated and tricked.  She admitted tricking him to get his candy and remembered that he would

try to "joke his way out of things to cover up [his cognitive shortcomings]." She was unable to hold a conversation with him and thought Moore was less mature than other children.

Moore's sister and aunt both testified that even at ages eleven and twelve Moore was unable to properly dress himself and would go outside in the winter underdressed for the cold, wearing only a t-shirt. According to Mr. Jackson, Moore had difficulty dressing himself until junior high. Ms. Easley agreed that this problem persisted into Moore's junior-high-school years. Mr. Brown testified that Moore did not learn to tie his shoes until about the eighth grade. Neither Mrs. Jackson nor Ms. Easley had ever seen Moore tell time.

### iv. Late adolescence

Mr. Jackson had tried to teach Moore to drive, but was unable to. Mr. Jackson was unaware and surprised that Moore had gotten his driver's licence because Mr. Jackson did not think Moore could pass the test. Mr. Jackson testified that he would not get into a car if Moore was driving. Similarly, although Moore's grandfather tried to teach him to drive a tractor, he was unable to grasp how the gears functioned.

Mr. Jackson had a business transporting railroad ties and let Moore work for him lifting heavy railroad ties. The standard procedure required one person lifting at each end of the tie at the same time. However, Moore did not understand that he had to coordinate his movements with the movements of the other person holding the other end of the railroad tie. Moore often threw his end down, leaving the other man with the entire weight of the tie. This endangered the men Moore worked with, and Mr. Jackson eventually had to stop allowing Moore to work for him.

Mr. Brown testified that he and Moore sometimes baled hay on Moore's grandfather's farm for extra money. They were paid by the bale, but Moore could not count money and could not tell

if he was given proper wage; nor could he tell if he was given the correct change at a store. Mr. Jackson recounted a time when Moore was a teenager applying for a job at a local business. Moore was unable to fill out the application, and a friend had to do it for him. Similarly, Mrs. Jackson testified that when Moore applied for a job at Mervyn's, he had to bring the job application home to fill out because he needed help with it. Mrs. Jackson did not believe Moore was sufficiently skilled in reading and writing to understand a job application by himself.

Moore was expelled from school in the eleventh grade because he punched the principal in the face. There was some evidence that Moore began a GED program and a job corps training program, but he apparently completed neither.

### v. Adulthood

As an adult, Moore was employed in several jobs that required little skill. Moore listed four previous employments on his Mervyn's employment application.[11] Moore had flipped burgers at a fast food restaurant and worked at a moving company. Whether he actually worked at the two other jobs was contested. One job Moore listed appeared to be his father's place of employment. The evidence was contradictory as to whether he merely went with his father to his father's job or whether Moore worked there himself. The other job Moore appeared to work at for only a few days. Moore had attendance and tardiness problems at his past employments, and Moore was fired from Mervyn's for similar reasons. At some point during his adulthood, and apparently before he committed the criminal offense that brought him here, Moore fathered a child who died as an infant.

Several officers from Moore's prison unit testified that Moore is able to communicate with them and follow the rules. While in prison, Moore married and divorced a girlfriend he had in the

---

[11] Whether Moore filled out the Mervyn's application by himself was also contested.

civilian world.  They testified that Moore's personal hygiene is acceptable and he keeps his cell in average neatness.  He appears to get along with both guards and inmates, and several guards testified he keeps books, magazines, and newspapers in his cell.  Guards also testified that they have observed him reading in his cell.  Finally, the guards admitted that prisoners help each other, including helping one another fill out necessary forms.

C. Experts' opinions

Dr. Llorente assessed Moore by interviewing him for seven to eight hours, interviewing his family members, and administering a battery of tests.  Dr. Llorente testified that there are several scales that can be used to measure a person's adaptive functioning, including the Vineland Adaptive Behavior Scales, but these scales were designed to assess adaptive behavior at the time they are administered, not retrospectively.  Accordingly, as the AAMR recognizes may be necessary, Dr. Llorente applied his clinical judgment rather than adaptive scales to assess Moore's adaptive behavior prior to age eighteen.

Dr. Llorente testified that Moore meets the adaptive functioning criterion for mental retardation.  Dr. Llorente found that Moore has significant deficits in adaptive behavior.  Moore's academic performance evidences a deficiency in conceptual skills.  Moore's social deficiencies are demonstrated in his being manipulated and taken advantage of by other children, his difficulty being part of a group and communicating as reported by his family, and his inability to avoid sexual abuse.  Moore's home life and work history evidence a deficiency in practical skills.  As a child Moore reportedly had problems dressing himself, and as an adult Moore had problems keeping a job and performing adequately, despite the fact that his jobs were unskilled and menial in nature.  Dr. Llorente noted that there was no evidence Moore ever paid rent or managed money.  Moore did not

21

seek help from others for either his stepmother's abuse or his problems with drugs, and Moore's self-report that he had tried to either take his life or mutilate himself also evidence deficiencies in the practical skill domain.

In order to assess Moore's adaptive abilities, Dr. Mears interviewed Moore for two to two and a half hours. Dr. Mears did not independently interview others who knew Moore as a child or adolescent. Although he listened to Moore's family members and acquaintances' testimony during the evidentiary hearing, he did not consider it because, according to him, they did not testify to anything significant enough to change his opinion. Dr. Mears based his opinion primarily upon his interview with Moore and Moore's responses to the Vineland scales. Dr. Llorente criticizes this methodology because Dr. Mears was only able to use some of the Vineland scales due to Moore's confinement. Furthermore, Dr. Llorente believed that Dr. Mears inappropriately utilized the scales by interviewing Moore rather than others who knew him because mentally retarded individuals often give inaccurate or unreliable historical information.

Dr. Mears was of the opinion that Moore did not have significant deficiencies in his adaptive functioning, but believed Moore has "very high adaptive functioning in terms of his work history," testifying that he "was kind of impressed that despite all his horrible childhood experiences, [Moore] had tried to get out there and learn a job." Based on Moore's transcripts and GPA, Dr. Mears found "[Moore's] academic functioning is really not bad at all. He got to the eleventh grade." Dr. Mears admitted he did not have enough information to have an opinion on Moore's social skills during junior or senior high school, but he believed Moore has "excellent social and interpersonal skills" based on Moore having had a girlfriend, the grief Moore experienced over the death of his infant daughter, and Moore's interview statement that he "preaches to the other prisoners." Again, while

22

Dr. Mears admitted he did not know the extent of Moore's self direction before age eighteen, he believes Moore now has self direction.

Dr. Mears concluded that Moore's adaptive functioning exceeds that of all the defendants Dr. Mears has seen in the last five years, and thus Dr. Mears could not find Moore mentally retarded regardless of Moore's IQ score. Dr. Mears conceded that Moore may be a slow learner and may have learning disabilities, but contended Moore was not mentally retarded because Moore made it to the eleventh grade.

### D. Court's findings

On all three criteria, but especially Moore's adaptive functioning, the Court finds Dr. Llorente's testimony and assessment more credible than Dr. Mears's. Dr. Llorente spent seven to eight hours interviewing and evaluating Moore, while Dr. Mears spent only two to two and half hours. Dr. Llorente contacted and interviewed Moore's family members to learn about Moore's childhood, while Dr. Mears did not contact or interview anyone[12] because he thought their opinions were not useful. Instead, Dr. Mears relied exclusively on his comparatively brief interview with Moore and his review of Moore's records. Dr. Llorente administered a large battery of tests to Moore. Dr. Mears also performed some tests on Moore, but not nearly as many.

Additionally, Dr. Mears's assessment of Moore's academic record appears less than comprehensive. While Dr. Mears placed a great deal of weight on Moore's advancement to the eleventh grade, there was no evidence that Moore was ever able to perform at the eleventh-grade level. In fact, there was strong evidence to the contrary, with most tests showing he was falling further behind his actual grade level each year. On Moore's Mervyn's medical history form, he

---

[12] Dr. Mears did attempt to contact Moore's ex-wife, but he was unable to locate her.

stated, "Some Time I have Those dizziness spell when over Heated." On his Mervyn's statement of injury form, he described how he injured his back, rather poorly printing:



These sentences do not appear to be written by someone functioning at the eleventh-grade level. Further, Dr. Mears's description of the academic functioning of an eleven-year old who performs below the third-grade level as "really not bad at all" seems conclusory, rather than analytical, in nature.

In order for Moore to satisfy this adaptive functioning criterion, he must have significant limitations, i.e. be two standard deviations below the mean, in either his conceptual skills, his social skills, or his practical skills. Because there is no objective standard to retrospectively measure Moore's adaptive behavior prior to age eighteen, both experts had to rely on their clinical judgment to make this assessment. Both agreed that Moore had some limitations, but Dr. Llorente testified that those deficits were significant and Dr. Mears testified that they were not.

### i. Conceptual skills

Conceptual skills include cognitive, communication, and academic skills. AAMD 10th ed. at 41. Examples are skills related to language, reading and writing, money concepts, and self-direction. *Id.* at 82. Moore's significant deficits in conceptual skills are the most striking of all his deficiencies. Notwithstanding the differing opinions of the two experts, the Court is most persuaded

24

by the objective and well documented standardized achievement test results reported in Moore's elementary school records. Moore never tested at his own grade level, and his standardized test scores placed him further behind each year, as shown in the chart below.

| Moore's age | Actual grade level | Functioning grade level | Difference between actual and functioning grade levels |
|---|---|---|---|
| 7 | 1-7 | 1- | -7 grade levels |
| 10 | 3.6 | 1.9 | 1.5 grade levels |
| 11 | 4-7 | 2-9 | 1-8 grade levels |
| 12 | 5-7 | 3-4 | 2-3 grade levels |

The fact that Moore struggled in learning to read and do math is substantiated by not only his school records but by substantial lay testimony as well. It is undisputed that Moore had to repeat the first grade, after which, although he was a year older than his classmates, he still performed poorly academically and was placed in special classes. Although Moore was in the eleventh grade when he was expelled, there is no evidence he was able to do any high-school level work. Moore made it to the eleventh grade by cheating off his sister and being passed along, or socially promoted, by his teachers. Moore's school records demonstrate his significant limitations in conceptual skills at an early age.

These limitations in conceptual skills are further evidenced by Moore's difficulty in following directions and learning new skills his entire life. Moore struggled until well into his school years to learn how to tie his shoes. Even in junior high school, he had a very difficult time following directions written on the chalkboard. As an older adolescent, Moore could not grasp the concept of working in unison with someone when lifting heavy objects. Moore had difficulty properly filling out a basic job application and was unable to count money and tell time. Throughout

his childhood and adolescence, Moore had difficulty learning new skills at appropriate ages such as learning to ride a bicycle, operating a tractor, and driving a car.

### ii. Social skills

Social skills include skills related to interpersonal relationships, responsibility, self-esteem, gullibility, naivete, following rules, obeying laws, and avoiding victimization. *Id*. Moore's history suggests that he has significant limitations in social skills.

Moore's limitations in social skills are evidenced by his victimization as a child. Moore did not comprehend the danger his father posed when he was intoxicated and did not know to run and hide when his father became violent. As a result of his deficient cognitive abilities Moore often suffered from his father's abuse and ultimately from his stepmother's repeated sexual molestations. Regarding gullibility and naivete, both Carl Jackson and Cynthia Easley testified that other children his age were able to exploit Moore's deficiencies and trick him out of his candy and money. Regarding following rules, Mary Hughes, one of Moore's middle school teachers, testified that she often observed him sitting out in the hall because of disruptive behavior.

Moore's history suggests that he lacks the ability to maintain lasting or productive relationships. He was described as a loner who was socially isolated and ostracized by other children for being slow. Several incidents during his developmental period suggest that he was unable to resolve disagreements or misunderstandings without recourse to violence. He was expelled from high school in the eleventh grade for punching the principal, he once attacked his girlfriend's car with a baseball bat, and he once discharged a firearm in his father's house, apparently while complaining to him about a different girlfriend.[13] In his 1993 intake interview with the Texas

---

[13] *See* Memorandum Opinion in *Moore v. Johnson*, 1:99-cv-18 (E.D. Tex. Nov. 9, 2001).

Department of Criminal Justice, he stated that he never got along with his father and he got along with his mother's side of the family, but no one else.

### iii. Practical skills

Practical skills include skills related to personal daily living activities such as eating, dressing, mobility, and toileting; instrumental daily living activities such as preparing meals, taking medications, using the telephone, managing money, using transportation, and housekeeping activities; occupational skills; and maintaining a safe environment. *Id.* The evidence indicates that Moore has some limitations in his practical skills. According to those who knew Moore as a child, he had trouble dressing himself long beyond the age that most children master this skill. Not only did Moore struggle with the physical aspects of dressing, such as tying his shoes or correctly buttoning his shirt, he also struggled with dressing appropriately, such as putting on clean clothes each day and dressing for the weather.

Moore's adult work history is ambiguous. While Moore held some unskilled positions, he had problems with absenteeism and apparently did not hold these positions long. Moore's ability to work in unskilled labor positions is not inconsistent with his otherwise demonstrated limitations in cognitive and adaptive functioning.

### iv. Conclusion

Considering all this evidence, Moore proved by a preponderance of the evidence that he meets the adaptive functioning criterion. Specifically, Moore has significant limitations in his conceptual and social skills that place him more than two standard deviations below the mean. While Moore also has limitations in his practical living skills, those limitations are not so great as to be considered significant.

### 3. Onset before age eighteen

#### A. Standard

In order to be assessed as mentally retarded, significantly subaverage intellectual functioning and related adaptive deficits must manifest before the individual is eighteen. If they manifest after age eighteen, the individual can be diagnosed with dementia, but not with mental retardation.

#### B. Lay testimony and other evidence

As described under the previous two criteria, the three IQ tests Moore has taken indicate he has significant subaverage intellectual functioning. Moore's first test, taken when he was six, meets the AAMR's standards for significantly subaverage adaptive functioning. As discussed, Moore's family members and acquaintances testified about Moore's adaptive deficiencies as a child and adolescent.

#### C. Experts' opinions

Based on his interview with Moore, his interviews with others who knew Moore as a child, and his review of Moore's school, work, and criminal records, Dr. Llorente testified that he believed Moore's intellectual and adaptive difficulties began before Moore reached age eighteen. Although he does not believe Moore is mentally retarded, Dr. Mears also agreed that Moore's deficits probably manifested before Moore was eighteen.

#### D. Court's findings

Moore's low IQ score at age six, his grades and standardized test scores, and the testimony that he began displaying significant adaptive deficiencies at a young age establish that his limitations in intellectual functioning and adaptive behavior manifested before his eighteenth birthday. Combined with the fact that both parties' experts agreed that any deficits arose before Moore was

28

eighteen, Moore established, by a preponderance of the evidence, this criterion of mental retardation.

## CONCLUSION

Having considered the law as set forth in *Atkins* and *Briseno,* the AAMR definition of mental retardation, the evidence presented at the hearing, and the briefs and arguments of counsel, the Court is of the opinion that Moore has established by a preponderance of the evidence that he is mentally retarded, which the United States Supreme Court held in *Atkins* protects such individuals from execution. Accordingly, the Court will issue a writ of *habeas corpus* to the Director, directing him to release Moore from custody unless the State of Texas, within 180 days, either permanently stays Moore's execution or reforms his sentence to life imprisonment.

**So ORDERED and SIGNED this 1st day of July, 2005.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**